| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>EASTERN DISTRICT OF NEW YORK<br>-------------------------------------------------------------- X<br>ROSS ROSENFELD,<br><br>                Plaintiff,<br><br>        - against -<br><br>THE CITY OF NEW YORK, NEW YORK CITY DEPARMENT OF EDUCATION, CHANCELLOR JOEL I. KLEIN, individually, GLORIA BUCKERY, individually, ANNE ORGANISCIAK, individually, JOHN DIRRIGL, individually, ANNE TULLY, individually, ANTHONY SHEPHERD, individually, KEITH KALB, individually, and KELLY DEVERS, individually,<br><br>                Defendants.<br>-------------------------------------------------------------- X | **NOT FOR PUBLICATION**<br><br><br><br>**MEMORANDUM & ORDER**<br><br><br>No. 06-cv-1979 (ERK) (VVP) |

KORMAN, District Judge.

In September, 2002, the plaintiff, Ross Rosenfeld, began work for the New York City Department of Education ("DOE") as a provisional probationary teacher at Shell Bank Intermediate School ("IS 14"). Defs.' 56.1 Stmnt. ¶ 2, ECF No. 241. Rosenfeld taught one inter-disciplinary seventh grade class during the 2002-2003 school year, for which he received a satisfactory year-end performance review from Ilene Agranoff, Principal of IS 14, and John Comer, District Superintendent. Pl.'s Exs. D, E. For the 2003-04 school year, Rosenfeld was promoted to a full-time probationary teacher, Pl.'s Ex. F ¶ 6.

In January, 2004, while proctoring a state-mandated science exam, Rosenfeld allegedly witnessed improper conduct by fellow teachers and Assistant Principals Susan Feeley and Anne Tulley. Pl.'s Mem. Law 3, ECF No. 246; Pl.'s Ex. B at 90-91. Rosenfeld alleges, for example, that during the exam Tulley "was pointing out answers, helping the children to measure things,

1

telling them what to do." Pl.'s Ex. B at 91. After the exam, Rosenfeld told fellow teacher Karen Richards that he was concerned with the behavior of the other proctors, to which Richards responded that Assistant Principals Tulley and Feeley had said it was acceptable to give answers to the students. Pl.'s Mem. Law 3, ECF No. 250. Sometime later in January, 2004, Rosenfeld anonymously contacted Carl Campanile, a reporter for the New York *Post*, to describe what he viewed as cheating. Pl.'s Ex. B at 91-94. Rosenfeld did not disclose his own name but did name the specific test during which he observed the alleged cheating. *Id.* at 94.

On February 24, 2004, Feeley and Assistant Principal Shepherd met with Rosenfeld to discuss the performance of students in Rosenfeld's classes. Defs.' Ex. O. This meeting was memorialized in a letter from Agranoff to Rosenfeld, dated March 3, 2004. *Id.* A vast majority of students were failing both of Rosenfeld's eighth grade English classes. *Id.* Rosenfeld attributed this to the students' poor performance on exams, homework, and classwork. Defs.' *Id*. Shepherd and Feeley discussed with Rosenfeld ideas to improve his students grades like selecting different novels to read and reviewing the testing material prior to exams. *Id*. Shepherd and Feeley also suggested that Rosenfeld visit other eighth grade English classes to learn successful strategies and techniques and said that they would make future visits to observe Rosenfeld's changes. *Id*. It is undisputed that Rosenfeld did not follow Shepherd's and Feeley's suggestions for how to raise his students' grades. Defs.' 56.1 Stmnt. ¶ 14; Pl.'s 56.1 Stmnt. ¶ 14.

Rosenfeld alleges that at the February 24 meeting Shepherd and Feeley warned that failing students creates the risk that students would have to be held back, in conflict with the DOE's "promotion policy." Pl.'s Ex. F ¶ 13. This policy, also known as "social promotion," is the practice of promoting students with poor or failing grades to the next class year under the theory that keeping students with their social peers is educationally beneficial. Pl.'s Mem. Law 4

n.1, ECF No. 250. Assistant Principal Feeley claims that Rosenfeld's grading violated school policy by giving scores below fifty-five. Defs.' 56.1 Stmnt. ¶ 13. Rosenfeld, however, claims that he was free to give grades lower than fifty-five because they would be automatically bumped up by the school administration. Pl.'s Ex. O ¶ 3.

On March 12, 2004, Rosenfeld was warned by Shepherd that Agranoff was still dissatisfied with Rosenfeld's students' grades and with Rosenfeld's resistance to the urgency of promoting students. Pl.'s Ex. F ¶ 15. On the same day, Rosenfeld contacted Carl Campanile again, this time using his real name, and also decided to record future conversations with the administrators of IS 14. Pl.'s Ex. F ¶ 17. Rosenfeld testified that he decided to record conversations because, in part, Agranoff and others were screaming at him and threatening to be in his classroom every day, though Rosenfeld did not clearly state why he thought this was happening. Pl.'s Ex. A at 35-35.

On March 29, 2004, Agranoff recommended to Rosenfeld that he improve his students' grades and that the grades reflected poorly on him. Pl.'s Ex. F ¶¶ 19-21. Rosenfeld replied that it was the responsibility of his students to improve, not his responsibility to raise their grades. *Id.* ¶ 20. Subsequently, on April 14, 2004, in a meeting secretly recorded by Rosenfeld, Agranoff explained that even students who fail and are deemed to have a "minimal understanding" of the subject matter will advance to the next grade. Pl.'s Ex. Q.

The defendants allege that in late April, 2004, all of the students in one of Rosenfeld's English classes walked out to complain to Agranoff that Rosenfeld had used inappropriate language with them. Defs.' 56.1 Stmnt. ¶ 19. According to Agranoff, the students said that Rosenfeld was a poor teacher and requested a new one. Defs.' Ex. D at 242-43. Rosenfeld asserts that only four students went to Agranoff to complain after class and only did so because

they were in trouble. Pl.'s Ex. O ¶ 7. Rosenfeld's students wrote five letters between April 29 and May 7, 2004, complaining of inappropriate behavior by Rosenfeld. Defs.' Ex. R. It is undisputed that in late April, Agranoff informed Superintendent Gloria Buckery that she was considering giving Rosenfeld an unsatisfactory rating at the academic-year-end review. Defs.' Ex. D 173-74; Defs.' 56.1 Stmnt. ¶ 18; Pl.'s 56.1 Stmnt. ¶ 18.

Rosenfeld alleges that Agranoff repeatedly visited his English classes throughout May, 2004, solely to harass him. Pl.'s Ex. F ¶¶ 35, 37. Around the same time, Agranoff requested that Rosenfeld participate in a mentor program, to which Rosenfeld refused. Pl.'s Ex. F ¶¶ 32-33. On May 21, 2004, Rosenfeld gave a speech to his labor union in which he called for a petition to remove Agranoff from her position as Principal of IS 14. Defs.' 56.1 Stmnt ¶ 8; Pl.'s 56.1 Stmnt. ¶ 8. Rosenfeld stated at deposition that he made this speech because he thought that Agranoff was corrupt for pushing teachers to comply with the social promotion policy, Pl.'s Ex. A at 52-53, although it is unclear from the record what specifically Rosenfeld said during the union speech. Agranoff stated at deposition that she knew that Rosenfeld spoke at the union meeting but did not know any details of his speech or that he called for her resignation. Defs.' Ex. D at 228.

On May 25, 2004, Agranoff again asked Rosenfeld to observe another teacher's class to learn class management skills. Defs.' Ex. B at 254-55. Rosenfeld refused, telling Agranoff that it was not necessary. *Id.* at 256-57. On June 2, 2004, Agranoff wrote to Rosenfeld that "we have tried to help you improve your teaching skills. You continue to be insubordinate. Your continued behavior can lead to further disciplinary action." Defs.' Ex. Q.

Also on June 2, 2004, Rosenfeld witnessed cheating by students while proctoring a state-mandated eighth grade social studies test and reported it to Vice Principal Feeley immediately.

4

Pl.'s Ex. F ¶ 52. Feeley said that there was nothing that could be done about student cheating and that Rosenfeld should not report it to Agranoff. *Id.* ¶ 53. Despite this suggestion, Rosenfeld reported the cheating to Agranoff, who instructed Rosenfeld to ignore it and refused to accept a list of students who were cheating on the exam. *Id.* ¶ 54. During this meeting, Rosenfeld asked if it was the goal of the school to graduate the students to the next grade, to which Agranoff responded "yes," and Union Representative Offerman said, "[w]e can't keep these kids back. Then the goal is to move these kids ahead to whatever extent we can." *Id.* ¶ 54; Pl.'s Ex. Q. Both the meetings were secretly recorded by Rosenfeld. *See* Pl.'s Ex. Q.

It is undisputed that on June 4, 2004, John Dirrigl, a Regional Instructional Specialist for the DOE, conducted an observatory evaluation of Rosenfeld's English class. Defs.' Ex. S. According to Superintendent Buckery, a school principal usually performs observatory evaluations, but Dirrigl, who is not a direct supervisor of Rosenfeld, was called in to ensure independence because Rosenfeld was at risk of receiving an unsatisfactory rating. Defs.' Ex. F at 28. Deputy Superintendent Organisciak stated that Dirrigl was used to provide an independent observation and an objective viewpoint. Pl.'s Ex. M at 33. Dirrigl's observation summary, signed June 17, 2004, factually detailed the happenings of Rosenfeld's class, concluding that "the lesson . . . presented on June 4 was unsatisfactory." Defs.' Ex. S. Dirrigl concluded his report, which was addressed to Rosenfeld, by stating "I am supporting the recommendation of your principal for an unsatisfactory rating." *Id.*

Since their first interaction on March 12, Rosenfeld had turned over to Campanile, the *Post* reporter, numerous recorded conversations, including ones with Agranoff and Feeley. Pl.'s Ex. F ¶ 60. On June 9, 2004, Campanile called Agranoff for comment on a potential story. *Id.* Agranoff did not take the call and testified that she did not know who the call was from at that

5

time. Pl.'s Ex. H at 165-66. On June 14 and 16, Superintendent Buckery and Organisciak asked Rosenfeld to turn over the tapes he had made of conversations with school administrators. Pl.'s Ex. F ¶¶ 63, 69-74. Just as he had in response to an earlier request, Rosenfeld again refused. *Id.* ¶¶ 69-74. Buckery testified that she wanted the tapes because "the accusation was a serious matter. I saw it as my responsibility to hear what was on the tape." Pl.'s Ex. N at 24.

Rosenfeld's annual professional performance review rated Rosenfeld unsatisfactory overall and recommended discontinuing his probationary teaching service. Defs.' Ex. N. Specifically, Rosenfeld was satisfactory in every metric used to rate "personal and professional qualities," but unsatisfactory in every metric used to rate "pupil guidance and instruction" and "classroom or shop management." *Id*. The memorandum was based on Agranoff's express recommendation, which Rosenfeld argues was "rubber stamped by the Superintendent." Pl.'s Mem. Law 19, ECF No. 250. The "substantiating documentation" included three letters written by Agranoff between May 11, 2004, and June 2, 2004, a letter written by Feeley and Shepherd on March 3, 2004, and the observatory report of Dirrigl, dated June 4, 2004. Defs.' Ex. N. On June 24, Rosenfeld signed the performance review and was told that he would not be asked to continue teaching. Pl.'s Ex. F ¶¶ 79-80.

## PROCEDURAL BACKGROUND

Rosenfeld originally filed this action on April 28, 2006 and after a series of amended complaints, counterclaims, settlements, and a partially granted motion to dismiss, filed a third amended complaint on February 25, 2009, asserting three causes of action. First, Rosenfeld alleges that he was subjected to adverse treatment and was wrongfully terminated in violation of the First Amendment and 42 U.S.C. § 1983. Third Am. Compl. ¶ 126. Second, Rosenfeld alleges that his Fifth and Fourteenth Amendment substantive due process rights were violated by

the DOE spokespersons' "reckless, intentionally damaging behavior," which was stigmatizing and foreclosed him from pursuing other job opportunities. Third Am. Compl. ¶ 139. Third, and finally, Rosenfeld alleges that the City of New York, the DOE, Kalb and Devers defamed him under New York State law by telling a reporter that Rosenfeld received two unsatisfactory evaluations during the 2003-04 school year. Third Am. Compl. ¶¶ 141-43. On December 10, 2010, the defendants filed this motion for summary judgment.

**DISCUSSION**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine issue of material fact exists when "a reasonable jury could return a verdict for the non-moving party." *Redd v. Wright*, 597 F.3d 532, 536 (2d Cir. 2010). In determining whether there is a genuine issue of material fact, the court must resolve all ambiguities, and draw all inferences, against the moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

### I. *Plaintiff's First Amendment Retaliation Claim*

The City defendants' memorandum of law in support of their motion for summary judgment argues that "[t]he only individual defendant plaintiff alleges violated his constitutional rights is Ilene Agranoff." Defs.' Mem. Law 15, ECF No. 242. Because all claims against her have been dismissed, they argue that Rosenfeld "does not have any constitutional claims against any of the individual defendants and his claims against them should be dismissed." *Id.* Rosenfeld does not respond to this argument. My review of the record indicates that the failure to respond is not without good reason.

7

Specifically, Rosenfeld alleged in his third amended complaint that the "decision to terminate [him] was made by Agranoff after significant consultation with Feeley and the other named defendants." Third Am. Compl. ¶ 100; *see also Official Committee v. Coopers & Lybrand*, 322 F.3d 147, 167 (2d Cir. 2003) ("the allegations in the [] Amended Complaint are 'judicial admission[s]' by which [the plaintiff] was 'bound throughout the course of the proceeding.'") (citation omitted). Agranoff and Feeley, however, are no longer named defendants because they were dismissed with prejudice pursuant to a settlement agreement, as were their cross-claims against Rosenfeld. Moreover, the other named defendants with whom Agranoff allegedly consulted are not identified by name.

This was not simply a slip of the pen in the drafting of the complaint. Indeed, Rosenfeld's memorandum in opposition to the motion for summary judgment states that Agranoff's motivation in terminating Rosenfeld is the issue of fact that remains in this case.

> Considering the speech . . . and the factors that led to Plaintiff's non-renewal, <u>it is easily concluded that there remains a question of fact as to the motivation by Agranoff in terminating Plaintiff's employment</u>. Agranoff acknowledged Plaintiff's speech. Feeley acknowledged Plaintiff's reoccurring speech and stated that Plaintiff just challenged the rules; that he complained about promotional folder policy of the chancellor. Agranoff stated that Plaintiff had a history of making complaints, that he would come to her "20 times a day." When realizing the frustration of Agranoff, a reasonable juror could conclude that the constant speaking out about systemic abuses on could motivate Agranoff to rate Plaintiff unsatisfactorily and get him out of her school so she did not have to listen to his speaking out any longer. Agranoff readily admitted that she did not document any of Plaintiff's alleged performance deficiencies. Plaintiff did not receive any notification of problems with his performance until February 2004, after he witnesses cheating on a state mandated exam. Feeley, and Shepherd immediately turned the grades of his students into an issue of Plaintiff's performance despite Feeley's admission that she had not witnessed Plaintiff teach the entire year. Agranoff, meanwhile, allegedly offered Plaintiff a mentor, in May 2004, knowing that she did not have the authority to offer a mentor. <u>While Plaintiff's non-renewal was ultimately rubber-stamped by the Superintendent, it was Agranoff who, as principal who initiated letters into his file, called in Dirrigl to give him the final unsatisfactory rating and who finally approved the non-renewal.</u>

Pl.'s Mem. Law 19, ECF No. 250 (emphasis added) (citations omitted).

Later on in his memorandum, Rosenfeld states that, "[a] reasonable jury can conclude that, based on what is heard in the tape recorded conversations with Agranoff, that retaliation was indeed a motivating factor in <u>her</u> termination of Plaintiff." *Id.* at 20 (emphasis added). Similarly, Rosenfeld concludes his argument on this issue by observing that, "[b]ased on all the facts, a reasonable jury could conclude that while Agranoff loaded the weapon for Plaintiff's firing before the union speech, she didn't pull the trigger until after it, and the final reason for the pull was her animus towards Plaintiff for the union speech. After all, Agranoff acknowledged that she knew of the speech but stated that she was the principal and she could do whatever she wanted, and that she 'absolutely' had the power." *Id.* at 24.

Rosenfeld's deposition testimony is entirely consistent with his complaint and his memorandum of law.

> Q. In this lawsuit one of your allegations is that your first amendment rights were violated; right?
> A. Yes.
> Q. Okay, who do you claim violated your first amendment rights?
> A. Ilene Agranoff, the department of education and perhaps others.
> Q. And perhaps others?
> A. Yes.
> Q. Do you know who these others are?
> A. Not certain.

Defs.' Ex. B at 49-50. Rosenfeld gave similar testimony with respect to the allegedly retaliatory conduct prior to his termination:

> Q. You said you were harassed; right, in violation of your first amendment rights?
> A. Yes.
> Q. Who harassed you that you thought was in violation of your first amendment rights?
> A. Ilene Agranoff . . . . And perhaps others.
> Q. You don't know who?
> A. Not certain.

> Q. What did Ilene Agranoff do to harass you?
> A. Threatened me.
> Q. What did she say to threaten you?
> A. She told me she would be in my classroom every day.
> Q. She do anything else?
> A. She said she was not through with me and instructed her secretary to get my file . . . . She wrote me up without cause.

*Id.* at 50-51.

Agranoff, and possibly Feeley, were the only two defendants who had any retaliatory motive arising out of Rosenfeld's allegedly protected expression. The dismissal of the case against them leaves Rosenfeld without any individual defendants who violated his rights. Consequently, I grant the motion of the remaining individual defendants for summary judgment on Rosenfeld's First Amendment retaliation claim. Even if Rosenfeld is correct that "there remains a question of fact as to the motivation of Agranoff in terminating [his] employment," the cause of action based on that conduct disappeared when Rosenfeld settled his case against Agranoff (and Feeley).

## II. *Plaintiff's Section 1983 Claims Against the City of New York and the DOE*

The fact that the case against Agranoff was settled would not relieve the City of New York of liability under Section 1983. Nevertheless, the City argues that, even if Rosenfeld's First Amendment rights were violated, it is entitled to summary judgment because the violations were not a result of any City policy or custom. Defs.' Mem. Law 14, ECF No. 242. I agree.

In order to succeed on his Section 1983 claim against the City of New York, Rosenfeld "must show that he was deprived a federal right by someone acting pursuant to an officially adopted custom, policy, or practice." *Green v. City of New York*, 06-cv-1836, 2009 WL 3319356, *7 (E.D.N.Y. Oct. 4, 2009) (citing *Monell v. Dept' of Social Services*, 436 U.S. 658, 694-95)). "Proof of a single incident of unconstitutional activity is not sufficient to impose

liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985); *see also Phelan ex rel. Phelan v. Torres*, __ F. Supp. 2d __, Nos. 04-cv-3538, 06-cv-1663, 2011 WL 7423768, *7 (E.D.N.Y. 2011).

Here, the record is devoid of any such evidence. Indeed, Rosenfeld does not argue that any existed, he merely argues that "the actions by defendants were not a single act." Pl.'s Mem. Law 27, ECF No. 250. While a custom giving rise to Section 1983 liability need not be formally approved, it does have to be "so widespread as to have the force of law." *Davis v. City of New York*, 228 F. Supp. 2d 327, 337 (S.D.N.Y. 2002). There is simply no proof of any practice or policy of terminating employees who speak critically of the DOE's educational policies. Nor does Rosenfeld make any allegations of retaliation taken against other teachers. Consequently, his municipal liability cause of action under Section 1983 fails.

### III. *Plaintiff's Defamation Claims*

After Rosenfeld had been terminated, Christopher Glorioso, a reporter for WPIX WB11 News at 10, was assigned to investigate Rosenfeld's allegations of cheating and the school's use of the social promotion policy in regards to the suspension of Agranoff and Feeley. Defs.' Ex. Y ¶ 2. On December 23, 2005, Keith Kalb, a spokesperson for the DOE, told Glorioso that Rosenfeld received "two unsatisfactory evaluations" and that he would have been terminated regardless of his whistle-blowing. *Id.* ¶ 6. Later, Rosenfeld told Glorioso that he only received one unsatisfactory rating. *Id.* ¶ 7. Glorioso then interviewed a different DOE spokesperson, Kelly Devers, who said that Rosenfeld had received more than one "unsatisfactory evaluation." *Id.* ¶ 8. Later that evening, Glorioso reported on WB News at 10 that the DOE "says Rosenfeld

was twice given unsatisfactory evaluations and that he would've been dismissed whether or not be blew the whistle on" the cheating scandal that lead to the firing of Agranoff and Feeley. Defs.' 56.1 Stmnt. ¶ 35; Pl.'s 56.1 Stmnt. ¶ 35.

Rosenfeld argues that this report was defamatory. Pl.'s Mem. Law 24, ECF No. 250. The defendants argue that they are entitled to summary judgment on plaintiff's defamation claim because the allegedly defamatory statement is in fact true and because the plaintiff failed to plead "special damages." Defs.' Mem. Law 16-17, ECF No. 242.

"[F]alsity is a *sine qua non* of a libel claim," thus a statement must be false to be actionable as defamation. *Brian v. Richardson*, 87 N.Y.2d 46, 51 (1995). It is undisputed here that, based on interviews with DOE spokespersons Kalb and Devers, Glorioso reported that Rosenfeld received "two unsatisfactory evaluations." Defs.' 56.1 Stmnt. ¶ 35; Pl.'s 56.1 Stmnt. ¶ 35. Rosenfeld admits that in June, 2004, he received one "unsatisfactory evaluation" from Agranoff. Pl.'s Mem. Law 24, ECF No. 250. On June 4, 2004, Regional Instructional Specialist Dirrigl observed Rosenfeld's class and in a report dated June 17, 2004, described his teaching performance as unsatisfactory. Defs.' Ex. N. Rosenfeld, however, argues that Dirrigl's unsatisfactory rating was an "observation" not an "evaluation." Pl.'s Mem. Law 24, ECF No. 250.

Rosenfeld's attempt at semantics here is unpersuasive. Dirrigl's written report states that his observation was to "conduct an independent assessment of [Rosenfeld's] performance . . . ." Defs.' Ex. N. An "assessment" does not differ in any way from an "evaluation." While Agranoff's evaluation was based on his observation of Rosenfeld's work over the course of a school year and Dirrigl's only the course of one class period, the word 'evaluation' does not assume or imply any temporality. Indeed, 'evaluate' means "to examine and judge concerning

the worth, quality, significance, amount, degree, or condition." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 786 (G. & C. Merriam Co. 1981). Dirrigl's report was conducted exactly for this purpose and it is an evaluation under any ordinary interpretation. Indeed, Rosenfeld's memorandum of law actually calls Dirrigl's report an "evaluation" on the page just prior to making this defamation argument. *See* Pl.'s Mem. Law 23, ECF No. 250 ("As admitted by Dirrigl, his *evaluation* of Plaintiff was not a formal observation.") (emphasis added). Accordingly, because Rosenfeld did receive two unsatisfactory evaluations, the allegedly defamatory statement is true and therefore not actionable.

IV. *Plaintiff's Due Process Claim*

Rosenfeld alleges that his Fifth and Fourteenth Amendment Due Process rights were violated when school officials made public comments about him having received two unsatisfactory evaluations, which stigmatized him and foreclosed his ability to secure employment elsewhere. Third Am. Compl. § 139; Pl.'s Mem. Law 25-26, ECF No. 250. This claim, called a "stigma plus" claim, requires that the plaintiff show "(1) the utterance of a statement about her that is injurious to her reputation, that is capable of being proved false, and that he or she claims is false, and (2) some tangible and material state-imposed burden . . . ." *Velez v. Levy*, 401 F.3d 75, 87 (2d Cir. 2005) (quotation omitted).[1] The allegedly stigmatizing information must be false. *See Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 446 (2d Cir. 1980). Here, however, as explained in the preceding section on Rosenfeld's

---

[1] Although Rosenfeld couches this argument as a deprivation of his substantive due process rights, a "stigma plus" claim is actually a type of procedural due process claim that also requires Rosenfeld to show that he was not afforded adequate process prior to the deprivation of which he complains. *See Segal v. City of New York*, 459 F.3d 207, 213 (2d Cir. 2006). Rosenfeld admits that the "DOE did not hold a hearing on [his] termination because [he] refused to grieve or appeal his dismissal." Defs.' 56.1 Stmnt. ¶ 33; Pl.'s 56.1 Stmnt. ¶ 33.

defamation claim, the statements made by school officials about Rosenfeld's unsatisfactory evaluations were true.

## CONCLUSION

The defendants' motion for summary judgment is granted in its entirety.